## LOUIS CURRAN ET AL.

*vs.*

## CONNECTICUT GAS PRODUCTS COMPANY, INC.

Superior Court      New Haven County      File No. 58500

### MEMORANDUM FILED MAY 13, 1941.

*Paul W. McMahon,* and *Lewis J. Somers,* of Meriden, for the Plaintiffs.

*Bronson, Lewis, Bronson & Upson,* of Waterbury, for the Defendant.

BOOTH, J.   The action is to recover damages for injuries to plaintiff's real property and to personal property of which the plaintiff is alleged to have been the bailee, which damages are alleged to have been caused by the maintenance of a nuisance by the defendant.   The nuisance is alleged to have consisted of the condition of the dams, bulkheads, gates and other appurtenant fixtures at the southerly end of Hanover Pond in the City of Meriden.

The obvious reason for basing the claim upon nuisance rather than negligence is that section 1680c of the 1935 Cumulative Supplement to the General Statutes provides in part that: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence. . . .shall be brought but within one year from the date of the act or omission complained of."

In the present case the act or omission complained of occurred on and prior to September 20, 1938, whereas the action was not instituted until January 20, 1940.   The above statute was pleaded in defense of any claim based upon negligence, hence such defense would bar the plaintiff from recovery upon

such ground. If then the plaintiff is entitled to recover at all it must be upon the theory of nuisance.

In addition to the above defense, the defendant has alleged that the injuries complained of by the plaintiff were caused by an act of God consisting of an extraordinary storm and unusual conditions of weather on September 19, 1938 and September 20, 1938 in and about the vicinity constituting the watershed of the Quinnipiac River at and above the dam referred to in the complaint, and at and above the plaintiff's property, which resulted in causing unprecedented volumes of water to flow into and down the Quinnipiac River and over, across and past the land of the plaintiff, which unprecedented volumes of water were the sole cause of damage to the plaintiff's property.

This defense is denied by the plaintiff and the issues presented are, first, whether plaintiff's property was in fact injured on the date alleged, and second, whether such injury was solely and proximately caused by an act of God. That the plaintiff's property was in fact injured on September 21, 1938, there can be no question. The evidence disclosed that at about 2 o'clock a.m. on that date a building and part of the land of the plaintiff, as well as certain personal property which the plaintiff claimed was in the building, were swept away and destroyed by a flood of water which came from the so-called Hanover Pond. Whether the defendant is legally liable to the plaintiff therefor depends upon whether such destruction was proximately due to its maintenance of a nuisance as alleged.

As previously stated, the nuisance is alleged to have consisted of the condition of the dams, bulkheads, gates and other appurtenant fixtures at the southerly end of Hanover Pond. These structures were in part, at least, located upon land of the defendant, and in the deed by which it acquired such land the defendant covenanted to maintain and keep them in repair. The claim of the plaintiff is that the defendant failed to thus keep and maintain them and that as a result of such failure the structures became and were a nuisance. The defendant claims that it did not fail in its duty to properly maintain the structures in question and that the condition thereof did not constitute a nuisance. It further claims that the condition of the structures was not a proximate cause of the plaintiff's damage. A nuisance arises from the creation

or maintenance of a condition having a natural tendency to cause danger and inflict injuries. *Gonchar vs. Kelson,* 114 Conn. 262, 271; *Stoto vs. Waterbury,* 119 id. 14; *Brock-Hall Dairy Co. vs. New Haven,* 122 id. 321, 326; *Hassett vs. Palmer,* 126 id. 468, 476.

According to the evidence it appeared that the property of the defendant was acquired by it on August 27, 1937, and consisted of a tract of land approximately 300 feet in width and 660 feet in length upon which were factory buildings designed to permit the machinery therein to be operated by water power. The property was bounded on the south by Main Street in East Meriden and on the north by a large body of water known as Hanover Pond. This pond had been created more than 75 years ago by the building of a dam and embankments across the Quinnipiac River. The dam consisted of a substantial sandstone wall backed up by an earth embankment, which was topped by heavy squared timber upon which there was a concrete slab. The total width of the dam was 171 feet and its height from the downstream river bed to the top of the spillway was about 17 feet. To the east of the spillway was located what are known as blow-off gates. These gates consisted of a heavy wooden structure, 43½ feet in width embedded in masonry abutments. At the bottom of this structure there were four wooden gates, each of which covered apertures three feet square. These gates operated upon iron cogs which were attached to upright timbers, and were designed for use in lowering the water in the pond when such was desired. Structurally these gates were in good condition on September 20, 1938. On that date two were entirely open, one was half-way open and the fourth was partly open. When water began to rise to an alarming extent on September 20, 1938, the defendant endeavored by all reasonable means to completely open all of the aforesaid gates, but a flood of water, due to an unprecedented rainfall which had occurred on that and several days previously, had brought down into the pond debris, including logs, stumps of trees, shrubbery, and so forth, and deposited them against the north side of said gates in such manner and to such extent as to prevent any further opening thereof, and the inability of the defendant to open said gates was not due to any negligence on its part.

A heavy earth embankment extended westerly from the

westerly abutment of the dam to a raceway or fore-bay channel, which raceway was designed to carry water from the pond through a penstock into the water wheel inside the factory building. This channel was about 20 feet in width. At the pond end of the channel there was a structure about 23 feet in width and about 20 feet in height, consisting of heavy wooden timbers embedded in masonry abutments. The purpose of this structure was to hold back the water from the pond and to release through four gates, similar to those before described, only such quantities of water as were desired to have flow through the raceway into the water wheel of the defendant's building. On September 20, 1938, these gates were closed and had been for some time prior thereto. At the time there was no engine in the defendant's building which required water power and the raceway structure was maintained merely as a dam to hold back the water from the pond. While some of the timbers of this structure showed signs of decay on their surface and while there were cracks between the planks which formed the face of the structure, repairs which had been made thereto in March, 1938, fortified the then existing condition and rendered the wooden portion in a reasonably safe condition to withstand the pressure of water against the pond side thereof on September 20, 1938.

As previously stated, this wooden structure was embedded in masonry abutments. These abutments were each about 12 feet square and about 20 feet high. One was located at the east and the other at the west side of the so-called raceway gates. That the easterly abutment was in a reasonably safe condition to withstand the pressure of water from the pond on September 20 and 21, 1938, is self-evident, as it completely withstood the flood in question. Across the top of the westerly abutment there was a crack extending downward for a distance of four feet into the masonry, but there was no satisfactory evidence that this crack in any way affected the strength of this abutment or of the raceway gate structure. Consequently it cannot be found that the westerly abutment was other than in a reasonably safe condition.

The westerly side of the aforesaid westerly abutment formed the northwest boundary of the defendant's land. To the west thereof the pond in question bordered upon land of one Flora B. Pendexter. To the north of and separating the Pendexter property from the pond there was an embankment composed

of a double stone wall with earth between and on the top thereof there were stone slabs. This embankment was about two and one-half feet higher than the crest of the spillway portion of the dam and was of the same height as the raceway gate structures.

From all of the evidence offered upon the subject of the condition of the banks and structures at the southerly end of Hanover Pond it is found that they were in a reasonably safe condition to withstand any ordinary pressure of water which the pond contained or had contained prior to September 20, 1938, and consequently did not constitute a nuisance within the legal meaning of that term.

For six days prior to September 20, 1938, considerable rain had fallen, constituting in all a rainfall of eight and six-tenths inches. On September 20, 1938, an additional rainfall of six and one-tenth inches occurred. Such a rainfall was unprecedented during the history of Hanover Pond. The drainage into the pond covered an area of 95 square miles and the unprecedented rainfall caused the water in the pond to rise to a height above that which had ever before occurred. During the afternoon of September 20, 1938, the water rose in the pond to such an extent that it not only flowed over the spillway and platform of the blow-off gates before mentioned but also flowed over the embankment to the west of the so-called raceway gate structures. This flow of water increased as the hours passed and caused an erosion of the bank somewhere within an area of 60 feet to the west of the westerly abutment of the raceway gates. The water flowing over this bank swirled to the west, eroding property located to the north of the plaintiff's property and finally, at about 2 o'clock a.m. on September 21, 1938, eroded the embankment which contained the westerly abutment to the raceway gates to such an extent as to cause such abutment to give way and carry with it the aforementioned wooden structure which constituted the raceway gates themselves. When this occurred a great body of water was released from the pond, which water, swirling to the west, eroded the plaintiff's property and carried away a portion thereof, together with the building thereon.

From the foregoing, and all of the other facts and circumstances which the evidence disclosed, it is found that the destruction of the plaintiff's property was not proximately caused

by the maintenance of a nuisance by the defendant, but was solely and proximately due to an act of God.

For the foregoing reasons judgment may enter for the defendant upon the issues of the complaint, and for the defendant to recover of the plaintiff its costs.